Filed 8/19/16  In re P.W. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re P.W. et al., Persons Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.F.,<br><br>Defendant and Appellant. | F073283<br><br>(Super. Ct. Nos. JV7454 & JV7455)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

Beth A. Melvin, under appointment by the Court of Appeal, for Defendant and Appellant.

Sarah Carrillo, County Counsel, and Cody M. Nesper, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Kane, Acting P.J., Franson, J. and Smith, J.

In this juvenile dependency case, two girls, P.W. and D.W., were removed from the custody of their parents, Daniel F. (father) and L.F. (mother). After reunification efforts failed, the juvenile court found the children likely to be adopted and entered an order terminating parental rights. (Welf. & Inst. Code, § 366.26.)[1] Father appeals, challenging the termination of his parental rights as to both girls. He contends there was insufficient evidence to support the juvenile court's finding that the children were likely to be adopted. We agree, reverse the juvenile court's order, and remand for the juvenile court to hold a new hearing under section 366.26 to select and implement a permanent plan for the children.

## PROCEDURAL AND FACTUAL SUMMARY

Dependency proceedings were initiated in March 2014 when the Tuolumne County Department of Social Services (department) took then five-year-old P.W. and three-year-old D.F. into protective custody after mother struck P.W., causing bruising on her buttocks. Father denied knowing that mother injured P.W. but knew she severely punished the children and he did not intervene. The responding social worker noted that both children were developmentally delayed.

Father and mother struggled with mental health problems. Mother suffered from depression and was prescribed an antidepressant but did not take it regularly. She stopped taking it about a month before the children were removed. Father suffered from post-traumatic cognitive disorder as a result of two serious brain injuries he sustained at the ages of nine and 19. He reported having problems with impulse control which he attributed to the second brain injury. He also reported using marijuana medicinally to control the pain associated with various medical conditions. Shortly after the children were taken into protective custody, father forced mother to leave the family home. He blamed her for the children's removal.

---

[1] Statutory references are to the Welfare and Institutions Code.

In April 2014, the juvenile court exercised its dependency jurisdiction over the children. The court also ordered father and mother to participate in reunification services which required them to establish a home for the children, address their mental health, substance abuse and parenting needs and visit the children weekly under supervision. The department placed the children with foster parents who specialized in caring for developmentally delayed children. The children remained there throughout these proceedings. No family members were identified as a placement option.

The juvenile court provided father and mother reunification services up to the 18-month review hearing in September 2015. During that time, they participated in their services, however, made minimal progress. As it turned out, their mental health status greatly impacted their ability to safely parent the children. This was discovered during psychological evaluations they completed with Dr. Blake Carmichael.

Dr. Carmichael evaluated mother and father in February 2015 to determine if they could benefit from reunification services. Dr. Carmichael opined that they could if they were willing to engage in therapy. Dr. Carmichael reported that father exhibited grandiosity and believed he had an exceptionally high level of skills. At the same time, he was aware that he had poor impulse control and difficulty managing his anger. However, he did not believe he needed therapy and was reluctant to learn or develop new skills to help him better manage his impulses. Rather, he attributed his lack of control to his head injuries and claimed he only had "2% control" over his emotions. Dr. Carmichael opined that father's head injuries directly affected his functioning and recommended that he participate in individual therapy to address any cognitive changes and learn coping skills to manage his anger and emotions. If father declined to do so, Dr. Carmichael cautioned, he would continue to place the children at a high risk for maltreatment.

3

Dr. Carmichael diagnosed mother with persistent depressive disorder with traits of a dependent personality disorder. He opined she could benefit from reunification services if she could develop insight into her mental health symptoms.

Dr. Carmichael reported that father and mother appropriately parented the children in a controlled setting. Father was loving and attentive to the children and was able to remain calm and emotionally regulated when they disobeyed him or became angry themselves. He was also able to parent them for a significant period of time in an uncontrolled environment while the mother was completing her evaluation. Mother, however, was less effective in an uncontrolled setting as she tended to be disengaged and distracted.

Dr. Carmichael reported that if father and mother discontinued therapeutic services, it would be a sign that they were not making progress.

By September 2015, the time set for the 18-month review hearing, father had participated in the majority of his services and was enjoying regular visitation with the children who were excited to see him. However, he was not motivated to participate in therapy and claimed not to need it. His motivation increased for a while in April 2015 after he became upset after seeing mother in a romantic embrace with another man and totaled his car. He was not injured but nearly hit a pedestrian. Father acknowledged his emotions got the best of him, causing him to place his own safety at risk. He expressed a need to work on gaining better control over his emotions. However, the following June, he got upset when his social worker refused to authorize him overnight visitation. He sent his therapist the following texts: "done getting raped by Child Welfare," "Giving Up" and "put a bullet in my head or get my girls back." He said that if the department did not return the children to his custody by June 2015, the department could adopt the children. After father's therapist relayed her concern to the department, father stopped attending therapy sessions, stating he did not want to see another therapist unless the therapist was "neurologically certified."

4

In its report for the 18-month review hearing, the department recommended the juvenile court terminate father and mother's reunification services and set a section 366.26 hearing. The department did not believe they had made sufficient progress to safely parent the children.

The department also detailed the children's special needs. P.W. was delayed in speech and language, rendering her difficult to understand. She underwent extensive developmental testing at a diagnostic center by a team of specialists. She scored average and even above average in some nonverbal measures but extremely low in verbal comprehension skills. The specialists found she had a language disorder, Attention Deficit/Hyperactivity Disorder (ADHD), a chromosome deletion, a moderate to severe speech sound disorder with characteristics of apraxia and non-developmental phonological processes.[2] She had previously been diagnosed with post-traumatic stress disorder (PTSD), reactive attachment disorder (RAD) and child neglect. She had difficulty transitioning from one activity to another and adjusting to new routines, experienced anxiety in public, was not afraid of strangers and had frequent nightmares.

D.W. also had speech and language delays and was receiving speech therapy. She had been diagnosed with severe obstructive sleep apnea and sleep disorder breathing. Her condition improved following an adenoidectomy.

The department reported that the girls were happy and flourishing with their foster parents who had been exceptional in meeting their special needs. However, the foster parents were not available for long-term placement of the children.

---

[2] "Apraxia" and "phonological disorder" are defined in the record: "Apraxia … is a neurogenic communication disorder affecting the motor programming system for speech production, specifically with sequencing and forming sounds." "[A] phonological disorder is a type of speech disorder known as an articulation disorder in which individuals do not use some or all of the speech sounds expected for their age group."

In September 2015, following a contested 18-month review hearing, the juvenile court terminated mother and father's reunification services and set a section 366.26 hearing for January 2016. Father challenged the court's setting order by extraordinary writ petition which we denied. (*D.F. v. The Superior Court of Tuolumne County* (Jan. 5, 2016, F072437) [nonpub. opn.].)

In its report for the section 366.26 hearing, the department recommended the juvenile court terminate parental rights and free the girls for adoption. According to the adoptions specialist, the children were likely to be adopted if parental rights were terminated. The California Department of Social Services (CDSS) had not identified a specific family suitable for adoption but was confident that a suitable family would be found. In the meantime, the foster parents were willing to care for the children. The department also opined that it would not be detrimental to terminate parental rights.

The department attached the children's adoption assessments to its report. The adoptions specialist reported that P.W. and D.W. were in good physical and emotional health. P.W. genetically tested positive for someone who was likely to develop Celiac disease which was reportedly associated with delays in speech and ability to focus. As a result, P.W. was placed on a gluten free diet and the foster mother reported a marked improvement in her speech and focus. In addition, P.W. was prescribed Ritalin for ADHD. However, her doctor was considering reducing or discontinuing the medication because P.W. was responding so well with dietary changes. She was also scheduled to meet with a specialist to determine whether her verbal apraxia could be treated with nutritional supplements.

Developmentally, P.W. was on target in both her fine and gross motor skills. She was receiving speech therapy for her verbal apraxia and occupational therapy to help with her sensory/texture issues and was showing improvement. The foster parents described P.W. as a friendly, sociable girl who enjoyed attention. She enjoyed books and educational workbooks. She was attending a kindergarten through third grade special

6

education class and was doing well in her classroom. She received a student award for the quarter. She performed well with the homework she was given and enjoyed being able to do as much as she could. She was learning to pronounce the sound of words and reading slowly in order to be understood more clearly. She also enjoyed puzzles and physical education class. The teachers were working with P.W. to develop healthy communication and boundaries.

D.W. was attending a transitional kindergarten and was ahead of her expected level in the class. She maintained an individual educational plan for her speech delay but had shown sufficient improvement that she may no longer need one. She was learning her alphabet, numbers and rhyming words and enjoyed coloring, drawing and building with Legos and Lincoln Logs. Socially, she had come out of her shell and made many friends in her classroom. Developmentally, she was on target in both her fine and gross motor skills. She was described as a smart, active and friendly little girl who enjoyed playing outdoors.

Father and mother opposed the department's recommendation to terminate their parental rights and the juvenile court scheduled a contested section 366.26 hearing for February 2016. Meanwhile, father filed a petition under section 388 asking the court to modify its order terminating his reunification services. He alleged he completed a parenting program and provided a certificate of his completion. He also alleged that he was participating in mental health treatment and had gained further insight into his issues. He asked the court to continue reunification services for him or return the children to his custody. He believed that the modification he proposed served the children's best interest.

The juvenile court scheduled the hearing on father's section 388 petition on the same date as the section 366.26 hearing. Father testified at the hearing about his efforts following the 18-month review hearing to ensure the girls would be safe in his care. He consulted a neuropsychologist who recommended he apply for social security disability

7

income. Father followed his advice and was waiting for a decision. He resumed in-home parenting classes and was waiting to get an appointment with a psychiatrist. He took steps to better manage his pain by quitting his job, receiving chiropractic treatment and massage therapy and considering spinal injections. He also started attending a support group. He had no plans to reconcile with mother and acknowledged that caring for the girls would be stressful but believed it would be fulfilling. He believed P.W. was eligible for an in-home care provider which would help him take care of her.

The juvenile court denied father's section 388 petition, finding that he had not shown a change in circumstances, and proceeded to the section 366.26 phase of the hearing. The parties submitted on the department's recommendation to terminate parental rights. The court advised counsel that it was concerned about the recommendation because the foster parents were not interested in adoption. County counsel argued that the fact that the children were not in a preadoptive home was not a sufficient basis to find they were not adoptable and that the adoptions specialist was an expert in that area and had found they were adoptable. Minor's counsel pointed out that the foster parents made it clear from the beginning that they would not be able to adopt the girls. Her understanding was that the foster parents were older and believed that the girls needed someone that would be able to care for them until adulthood and beyond. Father's attorney stated he did not have any evidence to dispute the adoption assessment but was concerned whether the girls were adoptable given their special needs. He asked the court not to terminate father's parental rights.

The juvenile court found the children were likely to be adopted and terminated parental rights. The court reasoned that the girls continued to improve developmentally and deserved permanency and that father and mother's parental rights could be restored if an adoptive family was not found.

This appeal ensued.

8

**DISCUSSION**'

Father contends the evidence was insufficient to support a finding that P.W. and D.W. were adoptable. We concur.

Whenever the juvenile court orders that a selection and implementation hearing be held, the court is required to direct the department to prepare an assessment as part of its report to the court. (§ 366.21, subd. (i)(1).) "The assessment report is 'a cornerstone of the evidentiary structure' upon which the court, the parents and the child are entitled to rely. [Citations.]" (*In re Valerie W*. (2008) 162 Cal.App.4th 1, 11.) The department is required to address specific subjects in the assessment report, including the child's medical, developmental, scholastic, mental, and emotional status. (§ 366.21, subd. (i)(1)(C).) In addition, the assessment report must include as relevant here an analysis of the likelihood that the child will be adopted if parental rights are terminated. (§ 366.21, subd. (i)(1)(F).)

The juvenile court has four choices at the section 366.26 hearing. "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption …; (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care." (*In re Celine R*. (2003) 31 Cal.4th 45, 52.) If a child is adoptable, adoption is the preferred permanent plan. (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 573.)

In order to terminate parental rights, the juvenile court must find by clear and convincing evidence the child is likely to be adopted. (§ 366.26, subd (c)(1).) "Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

"Usually, the issue of adoptability focuses on the minor, 'e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.' [Citations.] However, 'in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child.'" (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408.)

On appeal, we review the juvenile court's finding that a child is adoptable for substantial evidence. "[O]ur task is to determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, that the minor is adoptable. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.)

In this case, it is undisputed that P.W. and D.W. have extensive special needs. This was apparent from the beginning. For that reason, the department promptly placed them with a family experienced in caring for special needs children. Further, the full magnitude of their individual special needs was not fully realized until later in the proceedings after the children were more fully examined.

Father contends the children's extensive special needs rendered them unadoptable. We disagree that their special needs alone made them unadoptable. Rather, their special needs made it more difficult to find a prospective adoptive family. The department conceded as much when it conditioned their adoptability on its ability to identify a "suitable family"—one willing to work with the children's numerous service providers "at all times." Rather, what rendered these children unadoptable was the absence of a prospective adoptive family.

"It is well established that if a child has special-needs which render the child not generally adoptable, a finding of adoptability can nevertheless be upheld if a prospective

10

adoptive family has been identified as willing to adopt the child and the evidence supports the conclusion that it is reasonably likely that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

Here, no one had been identified as willing to adopt P.W. and D.W.—not a relative or a prospective adoptive family. In addition, the department provided no evidence from which the juvenile court could determine the likelihood that the children would be adopted other than the adoptions specialist's opinion that they were adoptable and the CDSS's confidence that a suitable family could be found. That evidence was insufficient to support a finding of adoptability. (*In re Asia L.* (2003) 107 Cal.App.4th 498, 512.)

We conclude the juvenile court's finding that P.W. and D.W. were likely to be adopted is not supported by substantial evidence.

## DISPOSITION

The order terminating father's parental rights as to P.W. and D.W. is reversed. The juvenile court is directed to conduct a new hearing under section 366.26 to select and implement a permanent plan for P.W. and D.W.